844 F.2d 1087
 128 L.R.R.M. (BNA) 2150, 56 USLW 2628
 U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
American Federation of Government Employees, AFL-CIO, Local
1923, Intervenor.
 No. 86-2619.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 1, 1987.
Decided April 19, 1988.
 
 Harold Jonathan Krent, Civil Div., Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., William Kanter, Civil Div., Dept. of Justice, Washington, D.C., on brief), for petitioner.
 Ruth Peters, Sol., Federal Labor Relations Authority (William E. Persina, Deputy Sol., Arthur A. Horowitz, Associate Sol., Robert J. Englehart, Washington, D.C., on brief), for respondent.
 Stuart Alan Kirsch, American Federation of Government Employees, AFL-CIO (Mark Roth, Gen. Counsel, Washington, D.C., on brief), for intervenor.
 Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON, and WILKINS, Circuit Judges, sitting in banc.
 WILKINSON, Circuit Judge:
 
 
 1
 In 1983, the Office of Management and Budget issued the current version of its Circular A-76. The Circular establishes executive branch policy for the performance of commercial activities. It guides agency managers in deciding whether a given activity should be performed "in-house" by government workers or should be "contracted out" to the private sector.
 
 
 2
 In collective bargaining negotiations between the United States Department of Health and Human Services and the American Federation of Government Employees, the union proposed a contract provision that would require HHS to make contracting out decisions in accordance with the provisions of Circular A-76. HHS argued that the proposal would usurp authority reserved by law to agency managers and refused to bargain over the proposal. The Federal Labor Relations Authority, however, ordered HHS to bargain over the proposal. HHS sought review of the Authority's decision. Because the proposal would encroach on prerogatives reserved by law to agency management, 5 U.S.C. Sec. 7106(a), and because it would create an inconsistency with a government-wide directive in violation of 5 U.S.C. Sec. 7117, we set aside the order of the Federal Labor Relations Authority and deny its cross-application for enforcement.
 
 I.
 A.
 
 3
 Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. Secs. 7101-7135 (1982), establishes a collective bargaining system for federal employers and employees. In establishing that system, Congress sought to safeguard the rights of employees to "organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them." 5 U.S.C. Sec. 7101(a)(1).
 
 
 4
 Title VII is not simply an "employees' rights" statute, however. In it, Congress sought to balance the public interest served by the protection of employees' rights against the public interest served by granting agency managers the powers needed to govern effectively. Congress recognized in Title VII "the special requirements and needs of the Government," and carefully directed that its provisions be interpreted "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. Sec. 7101(b).
 
 
 5
 Title VII subjects both federal employers and employee unions to a duty to bargain in good faith over "conditions of employment." 5 U.S.C. Secs. 7114(a)(4), 7103(a)(12). The Act defines "conditions of employment" broadly, to include "personnel policies, practices, and matters ... affecting working conditions." 5 U.S.C. Sec. 7103(a)(14). Agencies must make "good faith" efforts to reach agreement with employee representatives on subjects committed to bargaining, 5 U.S.C. Sec. 7114(a)(4), and where bargaining fails to produce an agreement, the statute provides for binding resolution of the dispute. 5 U.S.C. Sec. 7119(b), (c)(5)(B) & (C). A duty to bargain over a proposal, therefore, does more than simply require an agency to negotiate; it subjects the agency to the possibility that the proposal will become binding.
 
 
 6
 Recognizing the need to promote the effectiveness and efficiency of government, the Act limits the duty to bargain. The "management rights clause" of the Act reserves certain prerogatives to management, and exempts those subjects from bargaining. 5 U.S.C. Sec. 7106. That provision reads, in pertinent part:
 
 
 7
 [N]othing in this chapter shall affect the authority of any management official of any agency--
 
 
 8
 * * *
 
 
 9
 (2) in accordance with applicable laws--
 
 
 10
 * * *
 
 
 11
 (B) ... to make determinations with respect to contracting out.
 
 
 12
 5 U.S.C. Sec. 7106(a)(2)(B). Section 7117 of the Act further limits the duty to bargain, precluding negotiation over contract proposals that are "inconsisten[t] with any Federal law or Government-wide rule or regulation." 5 U.S.C. Sec. 7117(a)(1).
 
 B.
 
 13
 Circular No. A-76, published by the Office of Management and Budget, establishes "the policies and procedures used [by executive branch departments and agencies] to determine whether needed commercial or industrial type work should be done by contract with private sources or in-house using Government facilities and personnel." 44 Fed.Reg. 20557 (1979). A Supplement to the Circular "sets forth procedures for determining" whether a given activity should be performed by government employees or contracted out. Office of Management and Budget, Circular No. A-76 (Revised) 1 (1983) [hereinafter, OMB Circular A-76].
 
 
 14
 During negotiations between HHS and the union, the union proposed a contract provision that would require HHS to make contracting-out decisions in accordance with the Circular. Title VII requires all collective bargaining agreements to include grievance procedures, 5 U.S.C. Sec. 7121(a)(1), and provides that grievances that cannot be resolved satisfactorily through such procedures must be submitted to binding arbitration. 5 U.S.C. Sec. 7121(b)(3)(C). Because Title VII defines grievance to include claims of breaches of collective bargaining agreements, 5 U.S.C. Sec. 7103(a)(9)(C)(i), incorporation of the Circular's requirements in the collective bargaining agreement would subject disputes over the Circular's application to this grievance and arbitration procedure. 5 U.S.C. Sec. 7103(a)(9)(C)(i).
 
 
 15
 HHS determined the proposal to be nonnegotiable. The agency found that the proposal would violate the management rights clause by affecting management decisions to contract out. According to the agency, the proposal would at least delay the exercise of management's right to contract out. In some cases, it would result in arbitrators, rather than agency management, making substantive contracting out decisions. HHS also found that the proposal would violate Sec. 7117. It contended that incorporating the Circular's requirements into the collective bargaining agreement would subject disputes over its application to the Act's protracted grievance and arbitration procedures. HHS argued that this would create an inconsistency with a government-wide regulation, in this case the Circular itself, because the Circular provides for an exclusive, expedited appeals procedure.
 
 
 16
 The union petitioned the Federal Labor Relations Authority (FLRA) for review of HHS's finding of nonnegotiability, and the FLRA ruled that the proposal was subject to the duty to bargain. American Federation of Government Employees, AFL-CIO, Local 1923 and Department of Health and Human Services, 22 F.L.R.A. 1071 (1986). The FLRA held that the proposal was not inconsistent with the management rights clause of Sec. 7106 because it would not in itself impose any substantive limits on management's right to make decisions on contracting out, but would merely recognize existing constraints on that right. The Authority also held that the proposal did not violate Sec. 7117 because alleged violations of the Circular were already subject to the Act's grievance procedures, and the proposal therefore did not create any new right of appeal that was inconsistent with the Circular.
 
 
 17
 HHS moved for reconsideration, and when that motion was denied by the FLRA as untimely, appealed to this court. A divided panel enforced the FLRA's order. United States Department of Health and Human Services v. FLRA, 822 F.2d 430 (4th Cir.1987). Review by the en banc court followed.
 
 C.
 
 18
 The FLRA "is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the [Civil Service Reform] Act to the complexities' of federal labor relations." Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). We may overturn the FLRA's interpretation of Title VII only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Secs. 706(2)(A), 7123(c).
 
 
 19
 Despite the deference owed the FLRA, however, we must "decide all relevant questions of law [and] interpret constitutional and statutory provisions." 5 U.S.C. Secs. 706, 7123(c). We may "not 'rubber-stamp ... administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. at 97, 104 S.Ct. at 444. Here the FLRA has misconstrued the provisions of Title VII and undermined the intent of Congress to ensure the efficient and effective operation of government. The union's proposal violates both the management rights clause of Sec. 7106 and Sec. 7117(a)(1). Accordingly, we deny enforcement of the Authority's order.
 
 II.
 A.
 
 20
 Congress enacted the management rights clause to ensure that the collective bargaining system in Title VII would not undermine the effectiveness of government through unwarranted intrusion on management prerogatives. In broad and sweeping language, that clause declares that, with certain prescribed exceptions, "nothing in this chapter shall affect the authority of any management official of any agency" to exercise certain management authority, including the authority to contract out work. 5 U.S.C. Sec. 7106(a) (emphasis added). This language makes plain the priority Congress placed on the protection of management authority. It would have been difficult, if not impossible, for Congress to choose more emphatic or comprehensive language in drafting the management rights clause.
 
 
 21
 The legislative history of the clause, like its language, shows that Congress intended it to be both "broad," H.R.Rep. No. 1403, 95th Cong., 2d Sess. 12 (1978), reprinted in Subcomm. on Postal Personnel and Modernization, Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 (Comm. Print 1979) 675, 682 [hereinafter cited as Legislative History ], and "strong," 124 Cong.Rec. E4497 (daily ed. Aug. 10, 1978) (statement of Rep. Clay), reprinted in Legislative History at 843, or even "unusually strong." H.R.Rep. No. 1403, 95th Cong., 2d Sess. 377 (1978) (supplemental views of seven Representatives), reprinted in Legislative History at 721. Congress sought, in Title VII, to protect the "paramount right of the public to as effective and efficient a Government as possible," H.Con.Rep. No. 1717, 95th Cong., 2d Sess. 154, reprinted in 1978 U.S.Code Cong. & Ad.News 2723, 2860, 2888, and in Legislative History 793, 822, and strengthened management power in order to do so. See also Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. at 92, 104 S.Ct. at 441 (Title VII strengthened the position of public employee unions while "carefully preserving the ability of federal managers to maintain 'an effective and efficient government' ") (quoting 5 U.S.C. Sec. 7101(b)); National Treasury Employees Union v. FLRA, 691 F.2d 553, 560 (D.C.Cir.1982) (legislative history of the management rights clause "reflects a broader congressional desire to preserve the Federal Government's ability to operate in an effective and efficient manner"). Rep. Udall stated that Title VII
 
 
 22
 [M]oves to meet some of the legitimate concerns of the Federal employee unions as an integral part of what is basically a bill to give management the power to manage and the flexibility that it needs.... We are saying to the federal employees that we are going to give management some broad new rights here in this legislation, we are going to enable them to move. And employee organizations are saying, in turn, that they are entitled to have a more independent, secure position from which to deal with management as it operates under this new freedom in the bill.
 
 
 23
 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (emphasis added), reprinted in Legislative History at 923.
 
 
 24
 In order to ensure that collective bargaining does not interfere with the ability of government managers to conduct efficient operations, Congress deliberately "specifie[d] areas for decision which are reserved to the President and heads of agencies, which are not subject to the collective bargaining process." S.Rep. No. 969, 95th Cong., 2d Sess. 12-13 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 2723, 2734, and in Legislative History 740, 749-50. The rights reserved by the management rights clause, including the right to make decisions on contracting out, were considered so integral to management's ability to manage that Congress intended that managers "not negotiate under any circumstances" on them. H.Con.Rep. No. 1717, supra, at 153, reprinted in 1978 U.S.Code Cong. & Ad.News at 2887, and in Legislative History at 821. See also H.R.Rep. No. 1403, supra, at 43, reprinted in Legislative History at 689 (areas reserved to management by Sec. 7106(a)(2) "may not be subject to collective bargaining"). The conference report on the bill "emphasize[s] ... that nothing in the bill is intended to require an agency to negotiate on the methods and means by which agency operations are to be conducted." H.Con.Rep. No. 1717, supra at 154, reprinted in 1978 U.S.Code Cong. & Ad.News at 2887-88, and in Legislative History at 822.
 
 
 25
 In the context of the federal employer-employee relationship, there is a tension between effective and efficient management and collective bargaining. To manage, one must control and direct. The essence of bargaining, on the other hand, is compromise. Congress recognized this tension in Title VII, which strikes a balance between the public interest served by collective bargaining and that served by an effective and efficient government. Title VII imposes a broad duty to bargain. It also cordons off an area of management prerogative which Congress thought must be immune from the pressures of bargaining if government managers were to direct public agencies and conduct public business in the manner the public expects.
 
 B.
 
 26
 The management rights clause of the Act states that "nothing in this chapter shall affect" the ability of agency managers "to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a). The union proposal, however, would dramatically affect the right of agency managers to make contracting out decisions. It threatens, in fact, to divest agency managers of their authority to contract out and invest that authority in labor arbitrators.
 
 
 27
 Should the union proposal be found a subject of mandatory bargaining, HHS would be required to bargain in good faith over the proposal and would face the possibility that it would be ordered included as a binding provision of the contract. 5 U.S.C. Secs. 7114(a)(4); 7119. Were the proposal thus incorporated into the collective bargaining agreement, disputes over the application of OMB Circular A-76 would be subject to the grievance procedures and binding arbitration procedure required by Title VII. 5 U.S.C. Sec. 7103(a)(9)(C)(i); 7121(b)(3)(C). Submission of such disputes to grievance review and arbitration would "affect" management authority to contract out both by transferring from agency management to arbitrators substantive decision making authority and by delaying and destabilizing agency contracting out decisions.
 
 
 28
 Nothing in the statute or the Circular warrants any such result. OMB Circular A-76 is a managerial document. It provides few objective standards for review by arbitrators; its application calls for the exercise of judgment and discretion. For example, it directs that "commercial activity" be contracted out when permissible. OMB Circular A-76 at 1. Application of the Circular therefore begins with a determination of which activities are "commercial" and which are "governmental." These categories, however, are necessarily defined in inexact terms:
 
 
 29
 A Governmental function is a function which is so intimately related to the public interest as to mandate performance by Government employees. These functions include those activities which require either the exercise of discretion in applying Government authority or the use of value judgment in making decisions for the Government.
 
 
 30
 Id. at 2 (p 6(e)). In an attachment, the Circular provides a list of examples of commercial activities, but states that "[a]gency management must use informed judgment on a case-by-case basis in making these decisions." Id. at 7 n. 1 (emphasis added). Arbitrators reviewing the decisions of agency managers may not substitute their judgment for that of management when a decision is a matter of discretion. See National Treasury Employees Union v. FLRA, 767 F.2d 1315, 1317-18 (9th Cir.1985). However, where the entire decisionmaking process is permeated with discretion, as it is under the Circular, that substitution would be inevitable.
 
 
 31
 Reliance on agency judgment is a recurring theme of the Circular and its accompanying Supplement. See HHS v. FLRA, 822 F.2d at 444-45 (Wilkinson, J., dissenting). The Supplement, while providing detailed instructions for agencies to use in making decisions regarding contracting out, routinely requires agency managers to make subjective "judgment calls." Part I of the Supplement, "Policy Implementation," provides specific flowcharts which guide decisionmaking in a seemingly mechanistic fashion. These flowcharts, however, provide "mechanical" instructions only after an agency manager has made a discretionary decision. For example, in deciding whether new requirements should be met in-house or by contracting out, agencies must determine whether a given activity is "commercial" or "governmental," whether the "national defense" requires a commercial activity to be performed in-house, whether there is a "satisfactory" commercial source, and whether competitive contract costs would be "reasonable." OMB Circular A-76, Supplement at I-6. In the case of existing contracts, agencies must determine whether current contract costs are "reasonable and performance is satisfactory," whether prices offered by bidding contractors are "reasonable," and whether in-house performance is "feasible." Id. at I-8. It would be difficult to devise more discretionary criteria.
 
 
 32
 Part I also directs that in-house cost estimates be based on "the most efficient and cost-effective in-house operation needed to accomplish" the task at hand. Id. at I-12. While this directive seems, at first blush, to provide a purely mandatory rule, it provides an opportunity for arbitrators to second-guess managerial decisions. For example, in Headquarters, 97th Combat Support Group (SAC), Blytheville Air Force Base, Arkansas and American Federation of Government Employees, AFL-CIO, Local 2840, 22 F.L.R.A. 656, 661 (1986), the FLRA ruled that arbitral review of decisions on contracting out would not impinge on management rights because review would be limited to "mandatory provisions" of the Circular. The FLRA in that case upheld an arbitrator's reversal of an Air Force decision to contract out certain work, in part because the Air Force's cost comparison called for upgrading a job position. The arbitrator's decision was ostensibly based on the "mandatory" rule that cost comparisons be based on the most efficient and cost-effective operation. In fact, it allowed the arbitrator, who apparently disagreed with "the equally reasonable conclusion that, especially with regard to temporary work, a position staffed at a higher grade level might result in greater efficiency by attracting a higher quality employee," Ketler, Federal Employee Challenges to Contracting out: Is There a Viable Forum?, 111 Mil.L.Rev. 103, 147 (1986), to substitute his own judgment on a discretionary matter for that of agency managers.
 
 
 33
 Part III of the Supplement, "Management Study Guide," suggests ways in which agencies may identify the most efficient and effective organization for in-house performance of an activity. The organization so identified becomes the basis upon which cost comparisons are conducted and decisions on contracting out are made. OMB Circular A-76 Supp. at III-1. Although it advises management, the Management Study Guide is careful to note that it "does not purport to replace the agencies [sic ] own management techniques." Id.
 
 
 34
 The Management Study Guide again places broad discretion in the hands of agency managers:
 
 
 35
 Specific techniques used ... can range the entire spectrum of work measurement, value engineering, methods improvement, organizational analysis, position management and systems and procedures analysis.... The techniques chosen depend on the type of function involved and the data, time and analysts available.
 
 
 36
 Id. at III-3. It also requires managers to establish "performance indicators" which necessarily involve subjective judgments. For example, the Guide describes several "generally useful" indicators, including "Qualitative," which measures "how well outputs were produced against a standard," and "Effectiveness," which measures "mission performance." Id. at III-5, 6.
 
 
 37
 Part IV of the Supplement, "Cost Comparison Handbook," provides "detailed instructions" for use by agencies in comparing the cost of performing an activity in-house with the cost of contracting out the same activity. Id. at IV-1. Use of the Handbook is mandatory, id., and it is the most "mechanical" portion of the Supplement. Nevertheless, it still requires agency managers to make judgmental decisions, and arbitral review of its application would allow arbitrators to second-guess those decisions. For example, "[d]evelopment of the in-house staffing estimate is a crucial step of the cost comparison process." Id. at IV-7. Managers must construct an estimate that describes the most efficient and effective organization needed to accomplish an activity. Id. They may use "a variety of tools" to do so, including "manpower standards, staffing guides, prior experience, similar operations at other locations, actual work measurement and informed judgment." Id. (emphasis added). Arbitral review of decisions made on the basis of factors such as "prior experience" and "informed judgment" must either involve the substitution of arbitrators' judgment for that of agency managers or be meaningless.
 
 
 38
 Subjecting disputes over the application of Circular A-76 to grievance review and arbitration would also affect management decisions in violation of 5 U.S.C. Sec. 7106 by delaying the exercise of management authority and increasing the uncertainty faced by agencies and would-be contractors. The Circular's expedited appeals procedure requires that protests be received by the agency within fifteen working days after the agency releases the documents supporting its cost comparison. OMB Circular A-76 Supp. at I-15. The agency may extend this limit to thirty days where a cost comparison is unusually complex. Id. A decision on the appeal must be made within thirty days of receipt of the protest. Id. at I-14.
 
 
 39
 In contrast, the Act's grievance and arbitration procedures can take years. See Ketler, supra, at 141 n. 182. Were the union proposal adopted, union members could delay contracting out decisions indefinitely by merely filing grievances. This would undermine the Circular's own goal of facilitating prompt and efficient decisions. "Prompt resolution of government procurement appeals is imperative. Funds must be obligated, if at all, during the fiscal year for which they are appropriated, and undue delay in implementing either a contract award or in-house ... plan may, because of rapidly changing economic conditions, invalidate the original cost comparison." Id. at 117 (footnote omitted). The delay and uncertainty accompanying arbitral review may also undermine the bidding process by causing some firms not to bid on government projects, and others to include the costs of delay and uncertainty in their bids. The result in either case cannot help but "affect" the ability of agency managers to make decisions with respect to contracting out. Because Sec. 7106(a)(2)(B) states categorically that "nothing in this chapter shall affect " their authority to make such a determination, HHS can be required to bargain over the proposal only if the proposal comes within one of the exceptions to Sec. 7106(a).
 
 III.
 
 40
 There are three possible sources of limitation on the management rights clause. In finding that the clause would not be violated by requiring HHS to bargain over the proposal, the FLRA relied upon two of them. First, Sec. 7106(b) states that the management rights clause does not preclude negotiation over the procedures under which management authority is exercised. The FLRA held that the proposal would not impose substantive limits on management authority to contract out, but governed only negotiable procedures. Second, Sec. 7106(a) applies only to proposals that "affect" management authority. The FLRA held that bargaining over the proposal would not "affect" management rights because Sec. 7121 of Title VII subjects disputes over the application of Circular A-76 to the Act's grievance and arbitration procedures even in the absence of the union proposal. The requirement that managers follow "applicable laws," 5 U.S.C. Sec. 7106(a)(2), also limits the management rights clause, and that limitation would be relevant if Circular A-76 were such a law.
 
 
 41
 These three categories exhaust the possible limitations on the management rights clause. Because the requirement that HHS bargain over the proposal does not come within any of them, the management rights clause bars negotiation over the proposal.
 
 A.
 
 42
 Government managers are required to exercise their authority "in accordance with applicable laws." 5 U.S.C. Sec. 7106(a)(2). This limitation on the management rights clause does not justify requiring HHS to bargain over the union's proposal, however, because OMB Circular A-76 is not an "applicable law."[1]
 
 
 43
 Were the Circular held to be an "applicable law" within the meaning of Sec. 7106, it would be impossible for the executive branch to formulate policy directives, and for the President to instruct his subordinates, without giving rise to third party rights to challenge those policies and instructions. Whether an agency head is following the directives of the President is not for an arbitrator to determine. Were the internal management directives of the executive branch held to give rise to enforceable third party rights, the obvious result would be chaos. The President would be forced to compete with arbitrators over the interpretation of executive branch policy. Executive branch managers who formulated policy directives would cede control of their agencies to outside parties. Their only alternative would be to cease issuing such directives, which would also result in confusion and inefficiency. For these reasons, it has long been held that the executive branch may promulgate such instructions without creating rights and obligations enforceable by third parties. See Michigan v. Thomas, 805 F.2d 176, 187 (6th Cir.1986); Local 2855, American Federation of Government Employees v. United States, 602 F.2d 574, 582 n. 28 (3d Cir.1979); Independent Meat Packers Association v. Butz, 526 F.2d 228, 236 (8th Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). As an arm of the executive branch, OMB may issue Circulars that create no rights enforceable by third parties. In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1357 (D.C.Cir.1980).
 
 
 44
 Circular A-76 itself reflects these concerns. By its terms, it declines to create enforceable rights in third parties. It states explicitly that it "shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction on the basis that such action or inaction was not in accordance with" it. OMB Circular A-76 at 4. The Supplement to the Circular, in describing the Circular's appeals procedure, repeats this statement, declaring that "[t]he procedure does not authorize an appeal from outside the agency or a judicial review." OMB Circular A-76 Supp. at I-14.
 
 
 45
 It is more than simply sound managerial policy that dictates the legal status of the Circular. The executive branch, including OMB, simply has no power to make the law; that power rests exclusively with Congress. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587-88, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952). A Presidential order may have the force and effect of law when it is issued pursuant to statutory mandate or a delegation from Congress of lawmaking authority, Independent Meat Packers, 526 F.2d at 234, but Circular A-76 was issued pursuant to no such authority. It was issued pursuant to the executive branch's budget and management authority, by the Office of Management and Budget, "the President's principal arm for the exercise of his managerial functions." Reorganization Plan No. 2 of 1970, Message of the President, reprinted in 1970 U.S.Code Cong. & Ad.News 6315, 6316. It was intended as "a managerial tool for implementing the President's personal ... policies and not as a legal framework enforceable by private civil action." Independent Meat Packers, 526 F.2d at 236 (discussing Executive Order No. 11821).
 
 
 46
 Furthermore, the Circular provides no "law" to apply. It was updated in 1983, and courts considering whether its precursor was amenable to third party review uniformly held that it failed to provide justiciable standards. The Third Circuit held that it did not "provide rules or specifications that would permit a court to adjudicate plaintiffs' disagreements" with its application. Local 2855, 602 F.2d at 582. In American Federation of Government Employees, Local 2017 v. Brown, 680 F.2d 722 (11th Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983), the court found that even where a statute "elevate[d] some aspects of existing practice and procedure under Circular A-76 to the status of law," questions regarding its application were "committed to agency discretion" because they involved "managerial choices inherently unsuitable for the judiciary to consider." 680 F.2d at 724, 726-27. The current version of the Circular is more detailed than its predecessor, but as noted above, its "standards" remain premised on the exercise of managerial discretion and provide no basis for third party review. See Defense Language Institute v. FLRA, 767 F.2d 1398, 1401 (9th Cir.1985) (because the current Circular "lacks meaningful standards to guide management's discretion," its application, like that of its precursor, is not amenable to judicial review), cert. dismissed, 476 U.S. 1110, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986).
 
 
 47
 The Circular is thus not an "applicable law" under Sec. 7106, nor is its claimed violation grievable under Sec. 7103(a)(9)(C)(ii). Submitting disputes over the Circular's application to grievance procedures and arbitration would necessarily "affect" the exercise of management authority to contract out. See supra at II-B. Were claimed violations of the Circular grievable under Sec. 7103(a)(9)(C)(ii), Congress's express declaration that "nothing in this chapter shall affect" the right of agency managers to make decisions regarding contracting out would become a virtual nullity. In short, the Circular confers no grievable, arbitrable, or justiciable rights on third parties under Title VII of the Civil Service Reform Act of 1978.
 
 B.
 
 48
 The management rights clause does not exempt from bargaining "procedures which management officials of [an] agency will observe in exercising" their authority to make decisions to contract out work. 5 U.S.C. Sec. 7106(b)(2). The FLRA contends that the proposal is such a procedure and is therefore negotiable.[2] The proposal, however, is not a negotiable "procedure" because it would divest agency management of substantive decisionmaking authority.
 
 
 49
 Federal courts must often grapple with the distinction between substance and procedure, but because "procedures" frequently encroach, in varying degrees, on the realm of substance, the distinction is difficult to draw. See Department of Defense, Army-Air Force Exchange Service v. FLRA, 659 F.2d 1140, 1151 n. 64 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). "The line between 'substance' and 'procedure' shifts as the legal context changes," Hanna v. Plumer, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965), and the scope of Sec. 7106(b)(2) must be determined not simply by reference to labels, but in accord with congressional intent in enacting Title VII. See Department of Defense Army-Air Force Exchange Service, 659 F.2d at 1159-60.
 
 
 50
 There can be no doubt that Circular A-76 is, to some extent, procedural. It prescribes procedures to be used by agencies in making determinations on contracting out. The mere fact that the Circular has a procedural component does not, however, bring it within the scope of Sec. 7106(b)(2). The Circular describes a process to be used in making substantive decisions. The Authority's position ignores the difference between the criteria employed in making a decision and the procedure to be followed in carrying it out. Equal Employment Opportunity Commission v. FLRA, 744 F.2d 842, 855 (D.C.Cir.1984) (MacKinnon, J., dissenting), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). To ignore this distinction would erase the management rights clause, because "every management decisionmaking process would become a negotiable procedure." HHS v. FLRA, 822 F.2d at 446 (Wilkinson, J., dissenting).
 
 
 51
 The FLRA has held that the mere fact that a procedural requirement will delay the exercise of management rights does not remove that requirement from Sec. 7106(b)(2). In American Federation of Government Employees, AFL-CIO Local 199 and Army-Air Force Exchange Service, Dix-McGuire Exchange, Fort Dix, New Jersey, 2 F.L.R.A. 153, 156 (1979), the FLRA found negotiable a union proposal providing that an employee the agency had decided to suspend or remove could not actually be suspended or removed until the contractual grievance procedure, including arbitration, had been completed. The proposal did not touch on the substantive standards by which the grievance and arbitration procedure would be conducted; it required only that the procedure be completed before action was taken and its only foreseeable effect on the exercise of management rights was delay.
 
 
 52
 By contrast, the effect of the union proposal on management rights to contract out extends far beyond mere delay. By requiring that contracting out decisions be made "in accordance with OMB Circular A-76," the proposal does more than require management to perform the analysis in the Circular before contracting out. It opens up to grievance review and arbitration the question of whether management, in performing the analysis, performed it correctly, allowing arbitration to negate agency decisions. Third party review would inevitably result in arbitrators supplanting agency managers as the final arbiters of the Circular's discretionary requirements, and of government-wide contracting out policy. Such a result cannot be considered anything but "substantive."
 
 C.
 
 53
 The FLRA found the union proposal would not "affect" management rights because the proposal "would not change the statutorily prescribed scope and coverage of the parties' negotiated grievance procedure." AFGE v. HHS, 22 F.L.R.A. at 1073 (1986) (emphasis in original). The Authority contends that disputes over the application of the Circular fall within the purview of Title VII's grievance mechanism even in the absence of the proposal. It is difficult to imagine how the parties and the Authority could have constructed so keen a controversy as this over a proposal which, if the Authority's reading of the statute is correct, "gives the union nothing it did not already possess and deprives management of nothing it had not already lost." Defense Language Institute, 767 F.2d at 1402. The Authority's interpretation of the statute, however, is flatly contradicted by its plain language.
 
 
 54
 Section 7121 of Title VII requires all collective bargaining agreements to "provide procedures for the settlement of grievances." 5 U.S.C. Sec. 7121(a)(1). "Grievance" is defined to include:
 
 
 55
 ... any complaint--
 
 
 56
 (A) by any employee concerning any matter relating to the employment of the employee;
 
 
 57
 (B) by any labor organization concerning any matter relating to the employment of the employee; or
 
 
 58
 (C) by any employee, labor organization, or agency concerning--
 
 
 59
 (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or
 
 
 60
 (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.
 
 
 61
 5 U.S.C. Sec. 7103(a)(9). According to the FLRA, "[a]n allegation that [an agency] failed to comply with the OMB Circular, or with any other law or rule governing contracting-out, plainly falls within this expansive definition." AFGE v. HHS, 22 F.L.R.A. at 1073 (quoting EEOC v. FLRA, 744 F.2d at 850).
 
 
 62
 The FLRA's view again ignores completely the management rights clause, which states unequivocally that "nothing in this chapter shall affect" management's right to make determinations regarding contracting out. The FLRA seeks to escape the effect of the management rights clause by pointing to the requirement in Sec. 7106 that management rights be exercised "in accordance with applicable laws," and asserting that Sec. 7121 is itself an "applicable law." Id. at 1073-74 (quoting EEOC v. FLRA, 744 F.2d at 849-51).
 
 
 63
 The flaw in the Authority's reading of the statute is readily apparent. To read the statute this way is to read it to say "nothing in this chapter, except all the other provisions of this chapter, including Sec. 7121, shall affect [management] authority ... to make determinations with respect to contracting out." See EEOC v. FLRA, 744 F.2d at 857 (MacKinnon, J., dissenting). To read it this way would make grievable and arbitrable disputes over the exercise of all of the prerogatives reserved to management by Sec. 7106(a)--including the right to determine the mission, budget, organization, number of employees, and internal security practices of an agency--despite that section's clear command that "nothing in this chapter shall affect" management's exercise of that authority. In short, to read the Act as the Authority does would be to read the management rights clause out of the statute, and to undermine completely congressional intent.[3]
 
 
 64
 The Authority seeks to avoid the difficulty with its reading of the statute by arguing that the management rights clause does not limit Sec. 7121. Section 7121(c) exempts grievances on five specific subjects from the scope of grievance procedures in collective bargaining agreements. Grievances over contracting out decisions are not exempted, and the Authority therefore argues that Sec. 7121 requires that disputes over such decisions be subject to grievance procedures and arbitration. The Authority points, however, to absolutely nothing in the statutory language that indicates that the list of exemptions in Sec. 7121(c) is exclusive. Nor does the Authority point to anything in Sec. 7121 to indicate that that section is not subject to the broad and sweeping command of Sec. 7106(a), that nothing in 5 U.S.C. Secs. 7101-7135 may affect the exercise of reserved management authority. We must read "nothing in this chapter" to mean exactly what it says, and hold that the grievance and arbitration procedures required under Sec. 7121 may not "affect" the right to contract out under Sec. 7106(a).
 
 IV.
 
 65
 In addition to the management rights clause, Sec. 7117(a)(1) of Title VII further restricts the duty to bargain by "authoriz[ing] ... the issuance of governmentwide rules or regulations which may restrict the scope of collective bargaining." H.Con.Rep. No. 1717, supra, at 155, reprinted in 1978 U.S.Code Cong. & Ad.News at 2889, and in Legislative History at 823. Section 7117(a)(1) precludes negotiation over proposals that would create an "inconsisten[cy] with any Federal law or any Government-wide rule or regulation." The union proposal creates such an inconsistency, and is therefore nonnegotiable.
 
 
 66
 Because Circular A-76 is not a federal law, Sec. 7117(a)(1) can bar negotiation over the proposal only if the Circular is a "Government-wide rule or regulation" within the meaning of that paragraph. While the Circular, which was promulgated internally by OMB without any notice or comment, is not a "rule or regulation" in the ordinary sense of those terms, it is a "Government-wide rule or regulation" within the meaning of Sec. 7117(a)(1). Cf. National Federation of Federal Employees, Local 1497, and Department of the Air Force, Lowry Air Force Base, 9 F.L.R.A. 151, 154 (1982). In adopting Sec. 7117(a)(1), Congress specifically intended that that term "be interpreted as including official declarations of policy of an agency which are binding on officials and agencies to which they apply." H.Con. Report No. 1717, supra, at 158, reprinted in U.S.Code Cong. & Ad.News at 2893, and in Legislative History at 826.
 
 
 67
 The union proposal clearly conflicts with OMB Circular A-76. The Circular states that it "shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction on the basis that such action or inaction was not in accordance with this Circular," OMB Circular A-76 at 4, and establishes an exclusive appeals procedure which, by its terms, "may not be subject to negotiation, arbitration, or agreement." OMB Circular A-76 Supp. at I-15. The proposal would subject disputes over HHS's application of the Circular to Title VII's grievance and arbitration procedures, thereby nullifying these provisions.
 
 
 68
 Furthermore, the appeals procedure contemplated by the Circular differs markedly from that which the proposal would make effective. After supporting documentation is made available, appeals under the Circular must be received by the agency within fifteen working days, or, in "particularly complex" cases, thirty working days. OMB Circular A-76 Supp. at I-15. A decision must be reached within thirty calendar days of the appeal's receipt. Id. at I-14. None of these requirements apply to the Act's grievance and arbitration procedures, which may take several years. Ketler, supra, 111 Mil.L.Rev. at 141 & n. 182. The proposal thus creates glaring inconsistencies with the Circular and is therefore nonnegotiable.[4]
 
 V.
 
 69
 The FLRA's order suffers from several critical flaws. First, it effectively repeals an integral part of Title VII of the Civil Service Reform Act of 1978: Congress's broad and emphatic reservation of authority to agency management in Sec. 7106(a). Second, it contradicts the express terms of the Circular itself, in violation of Sec. 7117. Finally, the effects of the order are precisely what Congress attempted to avoid. By expanding the opportunities for delay and uncertainty, the order disrupts the bidding process and threatens the effective and efficient system created by the Circular for making contracting out decisions. It invests arbitrators with the statutory powers of agency managers to make substantive contracting out decisions, and divests the executive branch of the most rudimentary powers of self-governance. It transforms basic tools of management into occasions for intrusion. By granting to third parties the power to challenge and review reserved decisions, it presents agency managers with the Hobson's choice of surrendering control over the interpretation of policy directives or attempting to manage without such instructions to subordinates. The result in either case would be an ineffective and inefficient, if not chaotic, executive branch. We decline to enforce an order which so plainly contravenes congressional intent.
 
 
 70
 ENFORCEMENT DENIED.
 
 MURNAGHAN, Circuit Judge, dissenting:
 
 71
 Unlike the majority, I see no reason to deny enforcement of the FLRA's order requiring HHS to bargain over the Union's proposal. The FLRA's order is consistent with the agency's general duty to bargain in good faith over conditions of employment, and does not violate the management rights clause of the Civil Service Reform Act. While HHS now argues, and the majority finds, that Circular A-76 is not an "applicable law" under 5 U.S.C. Sec. 7106(a)(2) in accordance with which the agency must make its contracting-out decisions, I think it is highly improper for us to consider the issue because it is not properly before the court and therefore not within our jurisdiction to decide. I therefore respectfully dissent.
 
 I.
 
 72
 The Act provides that the FLRA's decisions are reviewable in accordance with section 10(e) of the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1982). See 5 U.S.C. Sec. 7123(c) (1982). Our review "is limited to whether the agency's construction [of its enabling statute] is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " United States Army Engineer Center v. FLRA, 762 F.2d 409, 414 (4th Cir.1985) (quoting 5 U.S.C. Sec. 706(2)(A)). Furthermore,
 
 
 73
 the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations....
 
 
 74
 On the other hand, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." ... Accordingly, while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act ... they must not "rubber stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." NLRB v. Brown, 380 U.S. 278, 291-292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).
 
 
 75
 Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (citations omitted).
 
 
 76
 Thus, the FLRA's decision should be upheld if it is reasonably defensible and not inconsistent with any congressional mandate or policy. Id.; EEOC v. FLRA, 744 F.2d 842, 847 (D.C.Cir.1984), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). I find the FLRA's order should be upheld in both respects.
 
 II.
 
 77
 Title VII of the Civil Service Reform Act of 1978 (the Act) (codified as amended at 5 U.S.C. Secs. 7101-7135) established a collective bargaining system to govern labor-management relations in the federal sector. Under the act, federal agencies and employee unions are required to bargain in good faith over "conditions of employment." 5 U.S.C. Sec. 7103(a)(12). The term "conditions of employment" is defined in the Act as "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." 5 U.S.C. Sec. 7103(a)(14).
 
 
 78
 The duty to bargain is limited by a management rights clause contained in the Act. See 5 U.S.C. Sec. 7106(a). In particular, the management rights clause provides that management has the authority "in accordance with applicable laws ... to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a)(2)(B). The procedures used in exercising this authority, however, are subject to negotiation. Id. Sec. 7106(b)(2).
 
 
 79
 Pointing to the introductory language of the management rights clause, which states that "nothing" in Title VII "shall affect the authority of any management official of any agency" to make decisions reserved to management, the majority finds that management has complete discretion in making contracting-out decisions. See slip op. at 8, 11 (quoting 5 U.S.C. Sec. 7106(a)). Indeed, the FLRA itself has recognized that the Act reserves to management as nonnegotiable the substantive exercise of its authority to make contracting-out determinations. NFFE, Local 1167 (Homestead Air Force Base), 6 F.L.R.A. 574 (1981), aff'd sub nom. NFFE, Local 1167 v. FLRA, 681 F.2d 886 (D.C.Cir.1982).
 
 
 80
 Unlike the majority, however, I believe the proposed provision would not establish any additional substantive limits on management's right to make contracting-out decisions. The FLRA found that HHS is required to adhere to the provisions of the Circular regardless of whether the Union's proposal is adopted as part of the collective bargaining agreement. The Union's proposal simply restates HHS's obligation to adhere to existing legal and regulatory requirements.[1] As a result, I agree with the FLRA's conclusion that the Union's proposal would not impair HHS's statutory right to make contracting-out decisions "in accordance with applicable laws."
 
 
 81
 The majority finds that the Circular is not a law, rule, or regulation within the meaning of section 7103(a)(9) and is not an applicable law within the meaning of section 7106. See maj. at 1094-96 & n. 1. In EEOC v. FLRA, 476 U.S. 19 (1986), the Supreme Court dismissed certiorari as improvidently granted and declined to reach or resolve the identical issue, because the issue had not been argued before the FLRA or the Court of Appeals. The Court stated that the "Act expressly provides that when an aggrieved party seeks judicial review of a final order of the FLRA, '[n]o objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances.' 5 U.S.C. Sec. 7123(c)." Id. at 1096. The Court noted that the language of Sec. 7123(c) is "virtually identical to that found in Sec. 10(e) of the National Labor Relations Act," which the Court has interpreted "to mean that a Court of Appeals is 'without jurisdiction to consider' an issue not raised before the Board if the failure to do so is not excused by extraordinary circumstances." Id. (citation omitted). This court should not now consider the issue for the same reasons.
 
 
 82
 HHS filed its Statement of Position with the FLRA on January 17, 1986 and did not raise the above argument. The Supreme Court's decision in EEOC v. FLRA was issued on April 29, 1986. Three months later, on July 31, 1986, the FLRA rendered its decision in the instant matter. It was not until October 1, 1986 that HHS filed a "Motion to Reconsider" in light of EEOC v. FLRA. The "Motion to Reconsider" was denied as untimely because such motions are required to be filed within 10 days after service of an FLRA order. 5 C.F.R. Sec. 2429.17.
 
 
 83
 There are no extraordinary circumstances warranting this court's consideration of the above issue. HHS had three months after the Supreme Court's EEOC decision to supplement its statement of position, but failed to do so. Furthermore, after the FLRA decision, HHS waited two months to file for reconsideration. Since the above argument was not timely presented to the FLRA, according to section 7123(c) of the Act, it is not within the jurisdiction of this court to consider the argument now.[2]
 
 
 84
 Incorporating the Circular into the collective bargaining agreement would subject disputes over violations of the Circular to the arbitration procedures contained in the Act. 5 U.S.C. Sec. 7103(a)(9)(C)(i). Subjecting such disputes to arbitration does not render the Union's proposal nonnegotiable for two reasons. First, as Congress clearly intended, the management rights clause exempts from its coverage any bargaining proposal concerning procedures governing agency contracting-out decisions. Second, contracting-out decisions are currently subject to grievance arbitration under section 7121 of the Act. I will discuss those points seriatim.
 
 A.
 
 85
 The majority finds that adoption of the Union's proposal would permit arbitral review of HHS's contracting-out decisions, and that such review would adversely affect the exercise of management's contracting-out authority.[3] The argument overlooks section 7106(b) of the Act. Arbitration is a procedure; management's nonnegotiable authority to contract out under section 7106(a) of the statute is "[s]ubject to" section 7106(b)(2), which provides for the negotiation of procedures that management will observe in exercising its authority to contract out. 5 U.S.C. Sec. 7106(b)(2). HHS, while admitting that subjecting management's contracting-out decisions to arbitral review is procedural in nature, contends that such review will have a substantive effect, because management will be forced to consider the potential impact of arbitration before making its contracting-out decisions.
 
 
 86
 The majority of this Court today joins the Ninth Circuit in adopting HHS' curious position. See Defense Language Institute v. FLRA, 767 F.2d 1398 (9th Cir.1985), cert. dismissed, 476 U.S. 1110, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986). In Defense Language Institute, the Ninth Circuit maintained that subjecting contracting-out disputes to arbitration would "divest management of the essence of its statutory authority to contract out" because arbitration would allow the neutral arbitrator to second guess the business judgment of management officials. 767 F.2d at 1401. The D.C. Circuit, by contrast, has adopted the FLRA's view that the proposed provision is a negotiable procedure. EEOC v. FLRA, 744 F.2d 842 (D.C.Cir.1984), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986).
 
 
 87
 The majority's contention that the decisionmaking process under the Circular is "permeated with discretion" and that therefore substitution of judgment by arbitrators "would be inevitable," slip op. at 13, is unpersuasive for several reasons. First, an arbitrator's ability to substitute his judgment for that of management is determined by the substantive standards for review and not by the mere fact that management's decision is subject to review. The arbitrator is not entitled to substitute his judgment for that of management when management's decision is a matter of discretion. NTEU v. FLRA, 767 F.2d 1315, 1317-18 (9th Cir.1985); AFGE, Local 1968 v. FLRA, 691 F.2d 565, 573-74 (D.C.Cir.1982), cert. denied, 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 297 (1983). Second, if the Executive Department does not like the substantive limits imposed by arbitrators interpreting the Circular, it may change those limits by amending its own Circular. Third, in the event an arbitrator exceeds his authority, management may take exception to the arbitrator's decision to the FLRA for review. 5 U.S.C. Sec. 7122; see, e.g., Blytheville Air Force Base, 22 F.L.R.A. 72 (1986). Finally, judicial review is available in the event an arbitrator imposes a limitation on management authority that is not "in accordance with applicable laws." 5 U.S.C. Sec. 7123.[4]
 
 
 88
 My belief in the negotiability under section 7106(b)(2) of a Union proposal that would authorize arbitration of disputes over the Circular is consistent with Congress' intention in adopting Title VII of the Civil Service Reform Act. The Act was adopted with the twin goals of expanding the right of collective bargaining and preserving the ability of the federal government to operate in an efficient manner. Defense Language Institute v. FLRA, 767 F.2d at 1401. The majority protests today that subjecting management rights to the decision of a neutral arbitrator would unduly interfere with the efficient operation of government. See maj. at 1093-94.
 
 
 89
 The majority's interpretation of Title VII of the Act ignores the delicate compromise that allowed the Act to be passed by Congress. The final version of the management rights provision of Title VII was added to the Act on the floor of the House through a compromise measure offered by Representative Udall, the floor manager of the bill, as a result of the demands of promanagement forces.[5] Labor sympathizers acceded to the demand for inclusion of the measure in return for the understanding that "the management rights clause is to be construed as a narrow exception to the general obligation to bargain in good faith." 124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978) (statement of Rep. Clay), reprinted in Legislative History at 932.[6] Congress intended Title VII to remedy the past problem of the Federal Labor Relations Council's (Council) overbroad interpretation of management rights.[7] Congress expressed such an intention in the Act by enumerating the management rights protected by the Act as exceptions to the general duty to bargain, 5 U.S.C. Sec. 7106, and by providing that Title VII and decisions of the new FLRA would supersede the Council's earlier decisions, which were anathema to organized labor. 5 U.S.C. Sec. 7135(b).[8] Representative Clay, who helped forge the Udall compromise, and the prolabor forces that supported the bill, emphasized that without acceptance of a canon of construction narrowly interpreting the scope of management rights, the bill would not be acceptable to a majority of Congress:
 
 
 90
 The whole structure and approach of title VII is [sic] in large part a repudiation of past Council practice. If we could not have been assured that identical language for management rights would be handled differently under the narrow construction mandated by title VII, the Udall compromise would never have been possible.
 
 
 91
 124 Cong.Rec. H9639 (daily ed. Sept. 13, 1978) (statement of Rep. Clay), reprinted in Legislative History at 934.[9]
 
 
 92
 The canon of construction that must guide resolution of the instant case, therefore, is that the management rights clause must be "treated narrowly as an exception to the general obligation to bargain over conditions of employment." 124 Cong.Rec. H9634 (daily ed. Sept. 13, 1978) (statement of Rep. Udall), reprinted in Legislative History at 924. Therefore,
 
 
 93
 [o]nly bargaining proposals which [are] directly related to the actual exercise of the enumerated management rights are to be ruled nonnegotiable. An indirect or secondary impact on a management right is insufficient to make a proposal nonnegotiable.... That the conference committee adopted this approach is reflected in the statement of managers that, in negotiations, "the parties may indirectly do what the (management rights) section prohibits them from doing directly."
 
 
 94
 124 Cong.Rec. H13607 (daily ed. Oct. 14, 1978) (statement of Rep. Ford), reprinted in Legislative History at 994.[10] Advocates of greater management prerogatives were unable to change this aspect of federal labor relations through the legislative process. Relying largely on its own views of appropriate labor relations policy and philosophy, the majority today effectively wipes out the Udall compromise insofar as procedures governing contracting-out are concerned. This court should not grant to management the protection that management was unable to secure from Congress.[11]
 
 
 95
 Under the applicable canon of construction, arbitration of a management right according to the substantive standards established by management is clearly a procedural proposal under Title VII. Any effect arbitration may have on management rights is only indirect. Thus, the FLRA is correct in its "conclusion that the proposal does not affect management's reserved authority, within the meaning of the statutory language, to make contracting-out decisions." EEOC v. FLRA, 744 F.2d 842, 848 (D.C.Cir.1984), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986).
 
 B.
 
 96
 I agree with the FLRA's finding that arbitration of disputes involving application of the Circular would be in accordance with applicable laws because section 7121 of the Act already subjects disputes over contracting-out work to the Act's grievance procedures. That provision states: "Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances ..." 5 U.S.C. Sec. 7121(a)(1). A grievance is elsewhere defined as "any complaint" by any employee or labor organization "concerning any matter relating to the employment of the employee" or by any employee, labor organization, or agency concerning "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. Sec. 7103(a)(9). Moreover, contracting-out is not enumerated in the five specific exemptions that Congress granted from the permissible scope of the grievance procedure. Id. at Sec. 7121(c). In light of the expansive coverage of the section, the FLRA found that the proposed collective bargaining provision did not infringe on contracting-out decisions because such decisions were already subject to arbitration.
 
 
 97
 There is a problem with the FLRA's view. The management rights provision and the grievance provision of the Act contradict each other. Section 7106 states that "nothing in this chapter shall affect the authority of any management official ... in accordance with applicable laws ... to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a). If applicable law includes section 7121, then section 7106 in effect reads: "nothing in this chapter except all the other provisions of Chapter 71, including Sec. 7121 ... shall affect the authority of any management official of any agency ... to make determinations with respect to contracting out." See EEOC v. FLRA, 744 F.2d at 857 (MacKinnon, J., dissenting). Thus, under the FLRA's view of the statute, the clause of section 7106 stating "nothing in this chapter" becomes essentially meaningless because it is modified by the phrase "in accordance with applicable laws" which includes the provisions of "this chapter."
 
 
 98
 A similar problem is encountered, however, if the nonnegotiability provisions of section 7106 are found to restrict the grievance provisions contained in section 7121. Section 7121 states: "Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances." If section 7106 restricts the scope of section 7121 by excluding grievances relating to management's exercise of its reserved rights from the section's coverage, then section 7121 in effect reads: "Except as provided in paragraph (2) of this subsection and in section 7106 of this chapter...." Thus, under the majority's view of the statute, the clause of section 7121 stating "except as provided in paragraph (2)" cannot be given its plain meaning because section 7121 is limited not only by paragraph (2) but by section 7106 as well.
 
 
 99
 When Congress' plain language does not convey its intention, the court " 'must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.' " Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956) (quoting United States v. Boisdore's Heirs, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850)).[12] The Civil Service Reform Act of 1978 was enacted by Congress at a time when federal labor policy had established a preference for arbitration of labor disputes.[13] The Supreme Court had declared that under federal labor law, as a general matter, arbitration of provisions restricting or regulating the exercise of management functions was not to be considered a forbidden infringement on management rights unless the parties presented "the most forceful evidence" that they intended to exclude a specific management function from arbitration. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584-85, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960). If Congress expected to reverse so fundamental a tenet of federal labor policy, it was obligated to set forth its intention explicitly within the new Act. Congress' failure to do so impliedly accepts the preference for arbitration.
 
 
 100
 Indeed, Title VII of the Act was adopted against a background not of unbounded management rights, but of collective bargaining rights that were previously established by Executive Order 11491.[14] Under Executive Order 11491, employee grievances involving disputes over employment conditions were subject to arbitration even if they involved nonnegotiable areas of management rights. Report of the Federal Labor Relations Council (June, 1971), reprinted in Legislative History at 1258, 1260-61. Title VII incorporated most of the provisions of Executive Order 11491 into law, but with several substantive changes. The changes resulted from delicate negotiations between the competing labor and management interests which are affected by the Act. The changes did not include a provision altering the practice of subjecting nonnegotiable management rights to arbitration procedures. If those competing interested parties were thus unable to incorporate a change in the Executive Order that formed the foundation of the Act, then such a change should not be made by this Court in the deal that was duly struck within the legislative process.
 
 
 101
 The legislative history of Title VII of the Act also explicitly indicates that arbitration of nonnegotiable management rights was possible under Sec. 7121.[15] The broad definition of grievance in Sec. 7103(a)(9) was put into the Act by the congressional conferees so that
 
 
 102
 so long as a rule or regulation "affects conditions of employment", infractions of that rule or regulation are fully grievable even if the rule or regulation implicates some management right. This interpretation of the definition is required both by the express language of the section and by the greater priority given the negotiability of procedures over the right of management to bar negotiations because of a retained management right.
 
 
 103
 124 Cong.Rec. H13609 (daily ed. Oct. 4, 1978) (statement of Rep. Ford) (emphasis supplied), reprinted in Legislative History at 998. In addition, during the House debates on the Udall compromise amendment to the Act, it was explained that the management rights provision was
 
 
 104
 still to be treated narrowly as an exception to the general obligation to bargain over conditions of employment.... [This amendment] preserves management's right to make the final decisions in these additional areas, in accordance with applicable laws, including other provisions of chapter 71 of title 5.[16] For example, management has the reserved right to make the final decision to "remove" an employee, but that decision must be made in accordance with applicable laws and procedures, and the provisions of any applicable collective bargaining agreement. The reserved management right to "remove" would in no way affect the employee's right to appeal the decision through statutory procedures or, if applicable, through the procedures set forth in a collective bargaining agreement.
 
 
 105
 124 Cong.Rec. H9634 (daily ed. Sept. 13, 1978) (statement of Rep. Udall), reprinted in Legislative History at 924.
 
 
 106
 There is nothing in the legislative history indicating that Congress intended that the reserved management rights listed in section 7106(a) be beyond the Act's grievance procedure. In fact, as shown above, the Act's legislative history clearly demonstrates Congress' intention that any contradiction between sections 7121 and 7106 be resolved in favor of the employee's right to grieve issues affecting management rights. Thus, it is clear that the unlawful exercise of a designated management right that is nonnegotiable is grievable under the Act's negotiated grievance procedure.[17]
 
 III.
 
 107
 The duty to bargain exists only "to the extent not inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. Sec. 7117(a)(1). The Circular provides that its provisions "shall not be construed to create" any right of appeal except as provided in the Circular itself. The majority finds that the FLRA's ruling, that the Union's proposal is negotiable, is in conflict with the Circular because the ruling subjects agency contracting-out decisions to the Act's grievance procedures, at 1098-99. I disagree with the majority's conclusion for two reasons. First, the Union's proposal does not create any new right of appeal, because, as discussed above, the right to file grievances regarding contracting-out decisions is created by the Act. 5 U.S.C. Secs. 7103(a)(9) and 7121(a).[18] Second, even assuming there is an inconsistency between the Act's grievance procedures and the Circular's appeal procedures,[19] there is no indication that Congress intended agencies to limit by regulation the statutorily defined grievance procedure of section 7121. EEOC v. FLRA, 744 F.2d at 851.
 
 
 108
 The Act's legislative history makes it clear that Congress intended that section 7117(a)(1) only bar negotiation over proposals that would bring about inconsistencies with law, rule, and regulation. See H.Con.Rep. No. 1717, 95th Cong., 2d Sess. 158, reprinted in 1978 U.S.Code Cong. & Admin.News 2860, 2892, and in Legislative History at 826. Thus, if a proposal's only inconsistency with a rule or regulation concerns grievance procedures, then section 7117(a)(1) would not bar negotiation of the proposal. The primary concern of the "not inconsistent with any ... law ... rule or regulation" clause of section 7117(a)(1) is with inconsistencies that would interfere with management's substantive rights. The Circular's appeals procedure does not affect the guidelines management must follow when making a contracting-out decision. Therefore, section 7117(a)(1) is not a bar to negotiation of the Union's proposal.
 
 
 109
 For the reasons stated herein, I believe that the FLRA's decision that the Union's proposal is negotiable should be upheld, and its order should be enforced. I therefore respectfully dissent.
 
 
 110
 Chief Judge WINTER, Judge PHILLIPS, Judge SPROUSE, and Judge ERVIN have authorized me to state that they join in my dissent.
 
 
 
 [1]
 The FLRA issued its decision in this case in July, 1986. HHS did not explicitly argue that OMB Circular A-76 is not an "applicable law" until it filed its Motion to Reconsider, which the FLRA rejected as untimely, in October, 1986. The dissent notes that the Civil Service Reform Act of 1978 "expressly provides that when an aggrieved party seeks judicial review of a final order of the FLRA '[n]o objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances.' " Infra at 1102 (quoting Equal Employment Opportunity Commission v. FLRA, 476 U.S. 19, 23, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986))
 For several reasons, however, we believe that this court can and should address this issue. See United States Department of Health and Human Services v. FLRA, 822 F.2d 430, 443 n. 2 (4th Cir.1987) (Wilkinson, J., dissenting). It has been fully briefed and argued before the Court of Appeals. See EEOC v. FLRA, 476 U.S. 19, 24, 106 S.Ct. 1678, 1681, 90 L.Ed.2d 19 (1986). The Authority was also fully apprised of its existence. At the time of the Authority's decision, there had been two conflicting decisions by the Courts of Appeals on the question of the grievability of violations of the Circular, Defense Language Institute v. FLRA, 767 F.2d 1398 (9th Cir.1985), cert. dismissed, 476 U.S. 1110, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986); Equal Employment Opportunity Commission v. FLRA, 744 F.2d 842 (D.C.Cir.1984), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986), and the Supreme Court was expressly awaiting the Authority's views on the question of whether the Circular is an "applicable law." EEOC v. FLRA, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986) (dismissing grant of certiorari). Despite the Supreme Court's expression of interest, the Authority dismissed as untimely HHS's attempt to raise the issue in its motion for reconsideration although the Authority could have waived its objection. 5 C.F.R. Sec. 2429.23(b) (1987). The procedural default rule invoked here by the Authority reflects "an intent that the FLRA shall pass upon issues arising under the Act, thereby bringing its expertise to bear on the resolution of those issues." EEOC v. FLRA, 476 U.S. at 23, 106 S.Ct. at 1680. It would stand that rule on its head to allow the Authority to use it willfully to avoid an opportunity to address this issue.
 
 
 [2]
 The FLRA's opinion in this case does not make explicit the Authority's reliance on this ground for its decision. In fact, when the panel majority in this case embraced this rationale, see HHS v. FLRA, 822 F.2d at 434-37, HHS objected, arguing that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The Authority here argues that its quotation of EEOC v. FLRA, 744 F.2d at 850-51, in which the D.C. Circuit adopted this analysis, constitutes reliance by the Authority on this ground for the decision. We need not decide whether the Authority may rely on this basis for its decision, because this analysis does not in any event support the decision
 
 
 [3]
 The dissent seeks to avoid this difficulty by finding a conflict between Sec. 7106(a) and Sec. 7121. It notes that Sec. 7121(a) requires collective bargaining agreements to provide grievance procedures "[e]xcept as provided in paragraph (2) of this subsection," and suggests that this language removes Sec. 7121 from the scope of Sec. 7106(a). Infra at 1106. A similar version of the passage quoted from Sec. 7121 also appears in Sec. 7117(a), however, and if that language has the significance suggested by the dissent, then the management rights clause limits neither grievance procedures nor the duty to bargain. Such a reading would nullify the management rights clause. We must therefore read Sec. 7106(a)'s command that "nothing in this chapter shall affect" management rights to mean what it says, and to include both grievances procedures and the duty to bargain. See Defense Language Institute, 767 F.2d at 1402; EEOC v. FLRA, 744 F.2d at 857 (MacKinnon, J., dissenting)
 
 
 [4]
 The FLRA held that Sec. 7117(a)(1) does not preclude negotiation over the proposal because the proposal "does not create any new right of appeal; the right to file grievances concerning contracting-out decisions is created by the Statute." AFGE v. HHS, 22 F.L.R.A. at 1075. As is discussed above at III-C, the statute does not create any right to file grievances concerning contracting-out decisions; rather, the management rights clause forbids the filing of such grievances
 
 
 [1]
 Before this court, in fact, counsel for HHS indicated that the Department intends to comply with the Circular in making any contracting-out decisions. This does not render the case moot for lack of a case or controversy, however, as HHS and the FLRA do argue over the proposal's negotiability. HHS contends that adoption of the Union's proposal would, for the first time, subject disputes relating to management's decisions to contract out work to the Act's grievance procedures and is therefore nonnegotiable as an infringement on management's reserved authority. The FLRA, on the other hand, contends that such grievances have always been subject to the Act's grievance procedures. One of the purposes of the Act is to encourage negotiation over prospective as well as current problems. Agreement as to how particular problems will be handled prior to their occurrence greatly reduces conflict in the event such problems do arise. The fact that there is no current controversy concerning a specific contracting-out decision does not mean this court lacks jurisdiction to determine the proposal's negotiability. Whether management has a duty to bargain under the Act over a particular proposal is a controversy in and of itself over which this court has jurisdiction. The cases which have found that jurisdiction exists to determine the negotiability of a specific proposal are legion. See, e.g., Defense Language Institute v. FLRA, 767 F.2d 1398 (9th Cir.1985) (proposal requiring adherence to OMB Circular A-76 held nonnegotiable), cert. dismissed, 476 U.S. 1110, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986); EEOC v. FLRA, 744 F.2d 842 (D.C.Cir.1984) (proposal requiring adherence to OMB Circular A-76 held negotiable), cert. dismissed, 476 U.S. 19, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986); see also American Federation of Government Employees, Local 1931 v. FLRA, 802 F.2d 1159 (9th Cir.1986) (management's policy of expeditious suspension of driving privileges held to be a nonnegotiable internal security practice); Department of Health and Human Services, Social Security Administration v. FLRA, 791 F.2d 324 (4th Cir.1986) (union proposal held nonnegotiable because it would violate SSA's right to assign work); Association of Civilian Technicians v. FLRA, 780 F.2d 12 (7th Cir.1985) (proposal relating to requirement that civilian technicians wear military uniforms while performing their nonmilitary duties is nonnegotiable); United States Department of Justice, Immigration and Naturalization Service v. FLRA, 709 F.2d 724 (D.C.Cir.1983) (proposal to bring probationary employees within mandatory grievance procedure held nonnegotiable); State of Nebraska Military Dept., Office of the Adjutant General v. FLRA, 705 F.2d 945 (8th Cir.1983) (proposals for grievance procedures culminating in binding arbitration found nonnegotiable because in conflict with the National Guard Technicians Act)
 
 
 [2]
 The majority opinion suggests that we should adhere strictly to the language of Sec. 7106 regarding contracting out decisions but ignore the command of Sec. 7123(c) that we may not consider on appeal an issue not raised before the FLRA. See slip op. at 19 n. 1. Section 7123(c) unambiguously forbids us to consider the issue of whether Circular A-76 is an applicable law within the meaning of Sec. 7106 because HHS failed to raise the issue before the FLRA in a timely fashion. Nonetheless the majority suggests that the FLRA should have rendered an advisory opinion on the subject because of the Supreme Court's concern over the issue or because it is entitled to waive its timeliness requirements in exceptional circumstances pursuant to 5 C.F.R. Sec. 2429.23(b). The FLRA declined to render such an opinion because no party before it suggested that the issue should be considered and because there were no exceptional circumstances justifying the agency's failure to raise it. Even if the FLRA's decision to leave the issue for another day was ill considered, the majority still fails to explain how we may reach the issue when there is no suggestion that the FLRA exceeded its legal authority in declining to consider it. Cf. NFFE, Local 1167 v. FLRA, 681 F.2d 886, 892 (D.C.Cir.1982) ("Congress' concern for the expeditious resolution of negotiability disputes mandates strict application of the time limits in section 7117(c) and rules out any obligation by the FLRA to supplement the parties' submissions.")
 
 
 [3]
 The majority joins HHS in assuming that if the Union's proposal is not adopted then arbitral review under the Act of management's compliance with the Circular would be unavailable. See maj. at 1092. As shown in Part B infra, however, HHS's contracting-out decisions are subject to arbitral review regardless of whether the Union's proposal is adopted
 
 
 [4]
 The practical effect of decisions to contract out is the shifting of work to the nonunion sector from union employees. As a result, challenges to contracting out decisions will typically be accompanied by unfair labor practice charges of antiunion discrimination. See 5 U.S.C. Secs. 7116(a)(1), (2) and 7123(a)(1). Therefore, arbitral decisions erroneously applying Circular A-76 will almost always be subject to judicial review
 
 
 [5]
 The management rights clause that appears in the Act was adopted as an amendment on the House floor to the clause reported by the House Committee on Post Office and Civil Service. The Udall compromise rejected the version of the bill reported by the Senate which simply codified the existing practices and decisions under existing Executive Order 11491. See S.Rep. No. 969, 95th Cong., 2d Sess. 104, reprinted in 1978 U.S.Code Cong. & Admin.News 2723, 2826, and in House Subcomm. on Postal Personnel & Modernization of the House Comm. on Post Office & Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 740, 764 (Subcomm.Print No. 7, 1979) [hereinafter Legislative History]. The amendment adopted on the House floor was adopted by the House-Senate Conference Committee without change. H.R.Rep. No. 1717, 95th Cong., 2d Sess. 153-54 (Conference Report), reprinted in 1978 U.S.Code Cong. & Admin.News 2860, 2887-88, and in Legislative History at 821-22
 
 
 [6]
 Rep. Clay chaired the Subcommittee on Civil Service. The Federal Labor Relations Council, which interpreted the Executive Order previously governing federal labor management relations, had broadly construed the management rights protected by that order. See 124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978) (statement of Rep. Clay) (Council has departed from the canon of construction that management rights clause should be interpreted narrowly), reprinted in Legislative History at 932; id. at H9648 (statement of Rep. Ford) (Council has interpreted the management rights clause too broadly, thwarting employees and administrators alike), reprinted in Legislative History at 953
 
 
 [7]
 Id. at H9638 (statement of Rep. Clay) ("Title VII is remedial legislation designed to cure the problems caused primarily by the Council's misinterpretation of the Executive Order"), reprinted in Legislative History at 932; id. at H9649 (statement of Rep. Ford) ("Title VII itself is remedial legislation"), reprinted in Legislative History at 955
 
 
 [8]
 See 124 Cong.Rec. H9651 (daily ed. Sept. 13, 1978) (statement of Rep. Ford) (Sec. 7135's " 'superseded' language is intentionally included to make clear that the new authority, acting under its own statutory charter, is not to repeat past mistakes in the area of labor-management relations. Title VII as a whole, and the management rights clause in particular, mandates [sic] a new approach to labor relations in the Federal Government...."), reprinted in Legislative History at 958
 
 
 [9]
 See also id. at H9649 (statement of Rep. Ford) (adoption of a narrow construction of the management rights provision "is an essential element in our working out the Udall compromise"), reprinted in Legislative History at 954
 
 
 [10]
 The remarks of Representative Ford, a member of the conference committee, explaining the final bill were endorsed by several other members of the conference committee. See 124 Cong.Rec. E5724 (daily ed. Oct. 14, 1978) (statement of Rep. Clay), reprinted in Legislative History at 1001; id. at E5727 (statement of Rep. Schroeder), reprinted in Legislative History at 1002
 
 
 [11]
 Judges must be honest agents of the political branches. They carry out decisions they do not make.... [G]ood judges make it easier for the political branches to strike compromises, to enact new laws.... Judges' claim to authority rests on a plausible demonstration that they are faithfully executing decisions made by others. The consequence of honest and capable discharge of that function may be more rent-seeking legislation, or it may be more general-interest legislation ... [w]hich occurs is not the judges' affair
 Easterbrook, The Supreme Court, 1983 Term--Foreword: The Court and the Economic System, 98 Harv.L.Rev. 4, 60 (1984) (footnote omitted).
 
 
 [12]
 The only way to resolve the conflict between sections 7106 and 7121 of the Act, while at the same time preserving the entire statute, is to classify arbitration as a section 7106(b)(2) negotiable procedure
 
 
 [13]
 AT & T Technologies v. Communication Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)
 
 
 [14]
 Executive Order 11491 is reprinted in Legislative History at 1244-57
 
 
 [15]
 Court decisions interpreting the Act have consistently concluded that management functions that are nonnegotiable under the Act may be subject to arbitration under Sec. 7121. See Cornelius v. Nutt, 472 U.S. 648, 652, 105 S.Ct. 2882, 2885, 86 L.Ed.2d 515 (1985) (agency procedures used in nonnegotiable disciplinary actions are subject to statutory grievance procedures); Andrade v. Lauer, 729 F.2d 1475, 1484-89 (D.C.Cir.1984) (application of nonnegotiable reduction-in-force rules and regulations is subject to statutory grievance procedures)
 
 
 [16]
 "Other provisions" includes section 7121 which established the Act's grievance mechanism
 
 
 [17]
 AFGE, Local 1336 v. FLRA, 829 F.2d 683, 687 (8th Cir.1987). The Act itself shows that Congress intended disputes concerning the exercise of management rights to be grieved under the provisions of the Act. The authority to take disciplinary action is a reserved management right listed in section 7106(a)(2)(A) which was excluded from the Act's grievance procedure by section 7121(c)(3). The exemption for complaints concerning disciplinary action would have been unnecessary if Congress believed that complaints concerning the exercise of a nonnegotiable management right were not subject to the Act's grievance procedures
 
 
 [18]
 The Circular itself indicates that it will not apply when it is in conflict with a statute: "This Circular and its Supplement shall not: (1) Be applicable when contrary to law...." 48 Fed.Reg. 37110 at p 7(c)(1) (1983)
 
 
 [19]
 The majority compares the appeals procedure provided in the Circular with Title VII's grievance and arbitration procedure, and concludes that they are impermissibly inconsistent because of the Circular's proviso that it "shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction on the basis that such action or inaction was not in accordance with this Circular." Maj. at 1099 (quoting OMB Circular A-76 at 4). It is patently obvious that this provision in the Circular is designed merely to prevent any claim of a private right of action arising from the Circular itself apart from the appeals procedure contained in the Circular. It does not purport to do something an internally promulgated executive branch rule cannot do in any event, namely limit the rights or remedies that may be conferred by a federal statute such as Title VII of the Civil Service Reform Act of 1978