SOCIAL SECURITY
ADMINISTRATION,
Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

American Federation of Government
Employees, AFL–CIO,
Intervenor.

SOCIAL SECURITY
ADMINISTRATION,
Respondent,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Petitioner,

American Federation of Government
Employees, AFL–CIO,
Intervenor.

Nos. 91–2065, 91–2102.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1991.

Decided Feb. 25, 1992.

As Amended March 5, 1992.

William Kanter, Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., John F. Daly, on brief), for petitioner.

Frederick Herrera, Federal Labor Relations Authority, Washington, D.C., argued

(William E. Persina, Sol., William R. Tobey, Deputy Sol., Arthur A. Horowitz, Associate Sol., James F. Blandford, on brief), for respondent.

Kevin Michael Grile, Asst. General Counsel, American Federation of Government Employees, AFL–CIO, Chicago, Ill., argued (Mark D. Roth, General Counsel, American Federation of Government Employees, AFL–CIO, Washington, D.C., on brief), for intervenor.

Before WIDENER and WILKINSON, Circuit Judges, and SHEDD, District Judge for the District of South Carolina, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

In this case we must decide a question relating to the duty of federal agencies to bargain with unions that represent federal workers. The Federal Labor Relations Authority held that the Federal Service Labor–Management Relations Statute, 5 U.S.C. § 7101 *et seq.*, requires federal agencies to conduct union-initiated midterm bargaining over issues not addressed by the applicable collective bargaining agreement. We conclude that union-initiated midterm bargaining is not required by the statute and would undermine the congressional policies underlying the statute. We therefore set aside the Authority's decision and deny its cross-application for enforcement.

## I.

### A.

The Federal Service Labor–Management Relations Statute (FSLMRS or statute), enacted as Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. § 7101 *et seq.*, establishes a comprehensive scheme governing labor relations between federal employers and their employees. Prior to enactment of the FSLMRS, a 1962 Executive Order and its successor governed labor relations in the public sector. *See* Exec. Order No. 10988, 3 C.F.R. 521 (1959–1963), *reprinted in* Subcomm. on Postal Personnel and Modernization of the House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., *Legislative History of the Federal Service Labor–Management Relations Statute, Title VII of the Civil Service Reform Act of 1978*, at 1211 (Comm. Print 1979) (hereinafter *Legislative History*); Exec. Order No. 11491, 3 C.F.R. 861 (1966–1970), *reprinted as amended in* 5 U.S.C. § 7101 note. The Executive Order accorded federal employees limited rights to engage in concerted labor activity. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA (BATF)*, 464 U.S. 89, 91–92, 104 S.Ct. 439, 441, 78 L.Ed.2d 195 (1983).

In enacting the FSLMRS, Congress determined that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" promotes both the public interest and "the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1). Thus, Congress "significantly strengthened the position of public employee unions." *BATF*, 464 U.S. at 92, 104 S.Ct. at 441. The FSLMRS, however, "is not simply an 'employees' rights' statute." *U.S. Dep't of Health & Human Servs. v. FLRA (HHS)*, 844 F.2d 1087, 1089 (4th Cir.1988) (*en banc*). Rather, in the statute "Congress sought to balance the public interest served by the protection of employees' rights against the public interest served by granting agency managers the powers needed to govern effectively." *Id.* In particular, Congress directed the courts to interpret the FSLMRS "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b).

The statute imposes a duty to bargain in good faith on both federal agencies and employee unions. *See id.* § 7114(a)(4). Failure to negotiate in good faith is an unfair labor practice. *See id.* § 7116(a)(5) and (b)(5). The FSLMRS, however, imposes significant restrictions on the scope of an agency's duty to bargain. For example, certain management prerogatives are not negotiable, *see id.* § 7106(a), and an agency

need not negotiate over any union proposal that is inconsistent with federal law or any government-wide rule or regulation, *see id.* § 7117(a)(1). Moreover, unlike in the private sector, in the public sector a union is prohibited from calling or participating in a strike or other job action. *See id.* § 7116(b)(7). If negotiations undertaken in good faith fail to achieve an agreement, the FSLMRS provides for binding arbitration before the Federal Service Impasses Panel (FSIP). FSIP, whose involvement may be invoked unilaterally by either party, *see id.* § 7119(b)(1), is authorized to impose any negotiable proposal on the agency. *See id.* § 7119(c)(5)(B) and (C). "A duty to bargain over a proposal, therefore, does more than simply require an agency to negotiate; it subjects the agency to the possibility that the proposal will become binding." *HHS*, 844 F.2d at 1089.

### B.

The facts underlying this case are not in dispute. In 1982, the Social Security Administration (SSA) and the American Federation of Government Employees (AFGE or union) entered into a collective bargaining agreement. The initial term of the agreement was three years, after which it was automatically renewed on a yearly basis. This agreement was in effect at all times relevant to this case. Article 7 of the agreement provided that either party could reopen, amend, modify, or terminate the agreement by providing the other party with notice between ninety and 120 days prior to its expiration date. Article 7 also included the following "reopener" clause: "Negotiations during the term of this agreement to add to, amend or modify this agreement may be conducted only by mutual consent of the parties." Further, Article 4 of the agreement contained detailed procedures for the conduct of so-called impact and implementation bargaining—*i.e.*, bargaining about SSA proposals, made during the term of the agreement, that would change the conditions of employment and about which midterm bargaining is required by the statute. *See* 5 U.S.C. § 7106(b)(2) and (3). Finally, the agreement provided that, in certain subject ar-

eas, SSA and the union could enter into supplemental agreements at the component level.

In December 1987, AFGE submitted to SSA a list of proposals over which it sought to initiate midterm bargaining. The AFGE proposals related to a subject about which the agreement was silent: the payment of relocation expenses for employees who relocate as a result of promotion from within SSA or other recruitment actions. On February 1, 1988, SSA by letter declined to participate in such bargaining. After AFGE filed a charge with the Federal Labor Relations Authority (FLRA) alleging that SSA had failed to bargain in good faith, the FLRA regional director filed an administrative complaint against SSA. The FLRA complaint alleged that SSA "has failed and refused ... to negotiate in good faith with the Union over Union initiated midterm bargaining proposals concerning payment of relocations expenses" and that such refusal constituted an unfair labor practice in violation of 5 U.S.C. § 7116(a)(1) and (5).

A hearing before an administrative law judge followed. Before the ALJ, SSA stipulated to all the factual allegations in the FLRA complaint. SSA argued, however, that federal agencies are not required to bargain over midterm union proposals and that, in any event, in the agreement AFGE waived its right to initiate midterm bargaining. The ALJ rejected SSA's arguments and concluded that SSA had committed an unfair labor practice. First, relying on FLRA precedent, the ALJ concluded that the FSLMRS obligated SSA to bargain over midterm union proposals that involve subjects not covered in the collective bargaining agreement. Further, the ALJ held that the agreement did not establish "a clear and unmistakable waiver" of the union's right to initiate midterm bargaining. According to the ALJ, although the reopener provision in Article 7 barred additions to the existing contract, it did not bar the execution of "a separate agreement covering any newly negotiated matters." Based on these conclusions, the ALJ issued a recommended cease and desist order.

SSA filed exceptions to the decision of the ALJ. The FLRA then affirmed the ALJ in a brief ruling and adopted his findings, conclusions, and recommended order. *See* 39 FLRA No. 52 (1991). Following that decision, SSA filed a petition for review and the FLRA filed a cross-application for enforcement of its order. AFGE has intervened in this appeal in support of the FLRA's position.

### C.

Before proceeding to the merits of the parties' arguments, we must place the question of union-initiated midterm bargaining in its historical context. The position of the FLRA before this court—that the statute requires an agency to engage in midterm bargaining over any issue not contained in the collective bargaining agreement, unless the union had waived its right to bargain about the subject matter involved—is contrary to the FLRA's initial resolution of this issue. In a comprehensive 1985 decision, the FLRA concluded that, "other than negotiations leading to a basic collective bargaining agreement, there is no obligation to bargain over union-initiated proposals." *Internal Revenue Serv. (IRS I)*, 17 FLRA 731, 736 (1985). The FLRA relied not only on statutory language, *id.* at 732–34, and legislative history, *id.* at 735–36, but also upon its conclusions that "an obligation to negotiate union initiated mid-term bargaining proposals did not exist under the Executive Order," *id.* at 737 n. 7, and that requiring union-initiated midterm bargaining would undermine the policies underlying the statute, *id.* at 736–37.

On review, the District of Columbia Circuit refused to enforce the FLRA decision. *See National Treasury Employees Union v. FLRA (NTEU)*, 810 F.2d 295 (D.C.Cir. 1987). Arguing that there was no support in the statute's text or legislative history for the FLRA's decision, *id.* at 298–99, and relying heavily on the fact that there is a duty to bargain midterm in private-sector labor relations, *id.* at 299–300, the court concluded that to deny a union the right to initiate midterm bargaining while an agen-

cy retained such a right would violate an asserted "statutory 'goal of equalizing the positions of labor and management at the bargaining table.'" *Id.* at 300–01 (quoting *American Fed'n of Gov't Employees v. FLRA*, 750 F.2d 143, 148 (D.C.Cir.1984)).

On remand, the FLRA simply adopted the position taken by the D.C. Circuit and concluded that:

[T]he duty to bargain in good faith imposed by the Statute requires an agency to bargain during the term of a collective bargaining agreement on negotiable union proposals concerning matters which are not contained in the agreement unless the union has waived its right to bargain about the subject matter involved.

*Internal Revenue Serv. (IRS II)*, 29 FLRA 162, 166 (1987). In subsequent cases, including the instant one, the FLRA has adhered to its position in *IRS II*, without additional discussion or analysis. *See, e.g., U.S. Army Corps of Engineers, Kansas City Dist.*, 31 FLRA 1231 (1988); *Internal Revenue Serv. (Dist. Office Unit)*, 29 FLRA 268 (1987).

### II.

We may set aside the FLRA's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), 7123(c). The FLRA "is entitled to considerable deference when it exercises its 'special function of applying the general provisions of the [FSLMRS] to the complexities' of federal labor relations." *BATF*, 464 U.S. at 97, 104 S.Ct. at 444 (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149–50, 10 L.Ed.2d 308 (1963)). An agency interpreting the statute it is charged with implementing is entitled to deference, however, only if "the statute is silent or ambiguous with respect to the specific issue" before the court. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Based upon our examination of "the particular statutory language at issue, as well as the language and

design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), we believe that "it is clear that [the FLRA's] interpretation is incorrect," *Fort Stewart Schools v. FLRA,* 495 U.S. 641, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990), because "Congress has directly spoken to the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. Accordingly, "we need look no further, 'for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Fort Stewart Schools,* 110 S.Ct. at 2046 (quoting *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82). As the Supreme Court has noted:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 (citations omitted).

### A.

■ The starting point for our analysis, of course, must be the language of the statute. A textual analysis is not definitive in this case, for the FSLMRS does not explicitly discuss union-initiated midterm bargaining apart from the context of agency changes in the conditions of employment. Nonetheless, we believe that the statutory language strongly suggests that bargaining over midterm union proposals was not mandated by Congress. In particular, Congress addressed the duty to bargain in language that seems to contemplate that such a duty arises as to only one, basic agreement: "Any agency and any exclusive representative in any appropriate unit in the agency, through appropriate representatives, shall meet and negotiate in good faith for the purposes of arriving at *a*

collective bargaining agreement." 5 U.S.C. § 7114(a)(4) (emphasis added). Likewise, the duty to bargain in good faith is defined to include the obligation to negotiate "with a sincere resolve to reach a collective bargaining agreement." *Id.* § 7114(b)(1); *see also, e.g., id.* § 7114(b)(5) (requiring parties "to take such steps as are necessary to implement such agreement").[1] Although Congress was surely aware that union-initiated midterm bargaining was an available option, it chose language that appears to exclude that possibility. The statutory assumption seems to have been that of one comprehensive agreement that serves to ensure workplace stability during its designated term.

Moreover, there is an additional indication in the statutory text that union-initiated midterm bargaining was not contemplated by Congress. Congress did contemplate that an agency was obligated to bargain midterm over the impact and implementation of changes in the conditions of employment initiated by the agency. *See* 5 U.S.C. § 7106(b)(2) and (3). When Congress did require midterm bargaining, it thus spelled out the context in which such bargaining was to take place. The inclusion of a specific duty of midterm effects bargaining, therefore, suggests the inadvisability of reading a more general duty into the statute.

### B.

This reading of the statutory text is confirmed by the statute's legislative history. A Senate report accompanying the Senate version of the statute explained an agency's duty of good-faith bargaining as follows:

> [The bill] provides that the agency and the labor organization shall negotiate in good faith for the purpose of arriving at an agreement. [¶] The parties have a mutual duty to bargain not only with respect to those changes in established personnel policies proposed by manage-

---

1. The FSLMRS does use the plural "agreements" once, in indicating that a union that has received exclusive recognition may "negotiate collective bargaining agreements covering[ ] all employees in the unit." 5 U.S.C. § 7114(a)(1). We view this reference merely as a generic statement that contemplates successive, not overlapping, labor contracts.

ment, but also concerning negotiable proposals initiated by either the agency or the exclusive representative in the context of negotiations leading to a basic collective bargaining agreement. Where agency management proposes to change established personnel policies, the exclusive representative must be given notice of the proposed changes and an opportunity to negotiate over such proposals to the extent they are negotiable.

S.Rep. No. 969, 95th Cong, 2d Sess. 104 (1978), *reprinted in Legislative History, supra,* at 740, 764. Thus, the Senate report indicates that an agency's duty to bargain arises in only two contexts: (1) during negotiations leading to "a basic collective bargaining agreement," and (2) in response to midterm changes by the agency in the conditions of employment. Given the absence of other relevant legislative history, we believe that this Senate report indicates that Congress did not intend an agency's duty to bargain in good faith to include union-initiated midterm bargaining other than in response to changes in employment conditions by the agency. Indeed, this is precisely how the FLRA interpreted the statute's legislative history in *IRS I. See* 17 FLRA at 735–36.

Rather than suggesting that this language bears a contrary meaning, the FLRA asserts that the District of Columbia Circuit was correct in refusing to rely on this Senate report. That circuit argued that reliance on Senate legislative history was improper because Congress eventually adopted the House version of the statute. Since the House version contained a somewhat broader view of collective bargaining in the federal sector than did the Senate version, the D.C. Circuit argued that Congress "repudiated" the Senate version and that the Senate legislative history did not "survive" this repudiation. *See NTEU,* 810 F.2d at 298–99.

With respect, we find this reasoning unpersuasive. The language from the Senate report quoted above explained the Senate version of what became 5 U.S.C. § 7114(a) and, in particular, described the nature of

the duty to bargain. In refusing to consider the report, the *NTEU* court overlooked the critical fact that the Senate version of the statute and the version ultimately adopted did not differ substantively with respect to either the nature or the timing of an agency's duty to negotiate. *Compare* S. 2640, 95th Cong., 2d Sess. § 7215(b)(1) (1978), *reprinted in Legislative History, supra,* at 520 ("An agency and an exclusive representative shall have a duty to negotiate in good faith and in exercising such duty shall ... approach the negotiations with a sincere resolve to reach an agreement.") *with* 5 U.S.C. § 7114(a)(4) ("Any agency and any exclusive representative in any appropriate unit in the agency, through appropriate representatives, shall meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement."). There were, of course, differences between the House and Senate versions regarding the permissible *subjects* for negotiations—primarily regarding the scope of the management rights provision. None of the versions of the statute, however, addressed the *timing* of negotiations. Neither the FLRA nor AFGE have pointed us to any indication in the legislative history that the differences between the Senate version and that ultimately adopted related in any way to the appropriateness of midterm bargaining or to any other questions regarding the timing of negotiations. In the absence of any indication that the House and Senate differed on this issue or on the nature of an agency's duty to bargain, reference to the Senate report is entirely appropriate.

### C.

■ We find further support for the conclusion that union-initiated midterm bargaining is not required by the statute in the practice under the Executive Order. Congress did not intend the FSLMRS to revolutionize federal-sector labor law. To the contrary, Congress intended the FSLMRS generally to codify the practice and policies applicable under the Executive Order.[2] As

2. Congress did intend the FSLMRS to broaden    the practice under the Executive Order in partic-

Congressman Udall, the primary sponsor of the House version that Congress ultimately enacted, stated:

> What we really do [in enacting this bill] is to codify the 1962 action of President Kennedy in setting up a basic framework of collective bargaining for Federal employees.... So we are now going to put into the United States Code instead of the Federal Register this basic plan of President Kennedy's that has worked so well in the last 15 years.

124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall), *reprinted in Legislative History, supra,* at 923. Congress wrote this presumption into the statute itself: "Policies, regulations, and procedures established under and decisions issued under Executive Orders 11491, 11616, 11636, 11787, and 11838, or under any other Executive [O]rder, as in effect on the effective date of this chapter, shall remain in full force and effect until revised or revoked by the President, or unless superseded by specific provisions of this chapter or by regulations or decisions issued pursuant to this chapter." 5 U.S.C. § 7135(b). And, relying on this presumption, courts have not hesitated to seek guidance from the practice under the Executive Order when the statutory language has been ambiguous. *See, e.g., BATF,* 464 U.S. at 103, 104 S.Ct. at 447; *NLRB Union v. FLRA,* 834 F.2d 191, 201–02 (D.C.Cir.1987).

The FLRA has presented no evidence that union-initiated midterm bargaining occurred under the Executive Order. Indeed, in its 1985 decision in *IRS I,* the FLRA concluded that "an obligation to negotiate union initiated mid-term bargaining proposals did not exist under the Executive Order" except in response to agency changes in employment conditions. 17 FLRA at 737 n. 7. Although it has since repudiated *IRS I,* the FLRA has never hinted that its prior conclusions about the pre-statute practice were incorrect. Thus, *IRS I* stands as persuasive evidence of the practice under the

Executive Order, which nothing in the statute purports to overturn.

## D.

■ In concluding that the statute requires an agency to participate in union-initiated midterm bargaining, both the FLRA and the District of Columbia Circuit in *NTEU* relied heavily on private-sector labor law. *See NTEU,* 810 F.2d at 299–300; *IRS II,* 29 FLRA at 165–66. It is not disputed that, under the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.,* the duty to bargain extends to midterm proposals initiated by either management or labor that do not conflict with the existing collective bargaining agreement. *See NLRB v. Jacobs Mfg. Co.,* 196 F.2d 680, 684 (2d Cir.1952). The *NTEU* court argued that long-standing private-sector precedent is properly applied to the public sector because:

> There is no question that Congress was fully aware of the analogy between the [FSLMRS] and the National Labor Relations Act (NLRA). Indeed, the FLRA was modeled on the NLRB, and other provisions of [the FSLMRS] are crafted either by analogy or by contrast. [¶] It is also apparent that Congress paid close attention to judicial precedent in private sector labor law when drafting the statute.

810 F.2d at 299 (citations omitted).

Whatever use private-sector labor law may have in other contexts, we do not believe that it is controlling here. As the Supreme Court has recently cautioned, the FSLMRS and the NLRA "deal with labor-management relations in entirely different fields of employment, and the FSLMRS contains no indication that it is to be read *in pari materia* with" the NLRA. *Fort Stewart Schools,* 110 S.Ct. at 2047. The District of Columbia Circuit has itself recognized that "the degree of relevance of private sector case law to public sector labor relations will vary greatly depending

---

ular areas—*e.g.,* by narrowing management rights somewhat. *See* H.R.Rep. No. 1403, 95th Cong., 2d Sess. 43–44 (1978), *reprinted in Legislative History, supra,* at 675, 689–90. The FLRA,

however, has provided no evidence—and we have found none—that the timing of negotiations was one such area.

upon the particular statutory provisions and legal concepts at issue." *Library of Congress v. FLRA*, 699 F.2d 1280, 1287 (D.C.Cir.1983); *accord American Fed'n of Gov't Employees, Local 2094 v. FLRA*, 833 F.2d 1037, 1045 (D.C.Cir.1987). "[T]he [FSLMRS] itself must ultimately be interpreted in the context of its *own* language, history, and case law." *National Treasury Employees Union v. FLRA*, 826 F.2d 114, 122 (D.C.Cir.1987) (emphasis in the original).

The differences between the FSLMRS and the NLRA persuade us that transference of private-sector labor law is inappropriate in this context. The NLRA explicitly provides that there is no duty to engage in midterm bargaining over matters "contained in" the collective bargaining agreement. NLRA § 8(d), 29 U.S.C. § 158(d).[3] The FSLMRS contains no comparable provision. We view the absence in the FSLMRS of a limitation on midterm bargaining comparable to § 8(d) as a strong indication that Congress did not believe that union-initiated midterm bargaining would be required under that statute. Although the FSLMRS recognizes public sector bargaining as important to the amicable settlement of workplace differences, the scope of such bargaining under the FSLMRS remains significantly narrower than that under the NLRA. *See Library of Congress*, 699 F.2d at 1287. Because Congress intended bargaining rights to be more limited under the FSLMRS than under the NLRA, we find it inconceivable that Congress would have omitted the § 8(d) limitation on midterm bargaining had Congress in fact intended the FSLMRS to require such bargaining in the first place.

Moreover, the *NTEU* court's suggestion to the contrary notwithstanding, *see* 810 F.2d at 300, there are important "practical distinctions," *id.*, between the public sector and the private sector that counsel against importing private-sector concepts into the FSLMRS in this context. In the private sector, once an impasse is reached, the union's alternative is often to strike—a drastic measure that is unlikely to be utilized midterm because all issues worthy of such action typically are resolved by the basic collective bargaining agreement. In the public sector, however, the union may move upon impasse to binding FSIP arbitration. *See* 5 U.S.C. § 7119(b) and (c). Because FSIP arbitration—unlike striking—is relatively costless for a union to invoke, many more midterm negotiations would be expected in the public sector than the private sector.

More important, public-sector unions could use binding arbitration over midterm proposals to achieve a tactical advantage that is absent in the private sector. A union can gain a tactical advantage by negotiating—and then arbitrating—issues seriatim rather than as a unified package. Yet the very essence of bargaining is compromise and concession. By withholding a particular proposal during the negotiations over the basic agreement, a union avoids the necessity of making a concession to the agency in order to achieve agency acceptance of the proposal, but it keeps alive the possibility of obtaining the proposal through subsequent imposition by FSIP arbitration. Moreover, by arbitrating a string of unrelated proposals piecemeal rather than in the context of negotiations toward a basic agreement, a union may be able to achieve an overall set of arbitration-enforced concessions that exceeds both what it could have obtained through one set of unified negotiations leading to a basic agreement and what an arbitrator would have awarded had all issues been arbitrated together. These concerns are simply absent in the private sector, because the NLRA, unlike the FSLMRS, provides no statutory mechanism by which an employer who has bargained in good faith to impasse can be forced to binding arbitration against its will. *See NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 401–04, 72 S.Ct. 824, 828–30, 96 L.Ed. 1027 (1952).

---

**3.** Section 8(d) provides, in pertinent part, that the duty to bargain: shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.

One final factor suggests that Congress should not be charged with silently transplanting the private-sector rule into public-sector labor relations. In the public sector a union faces less of a financial disincentive to midterm bargaining than is present in private-sector labor relations. That private-sector unions must incur the expenses entailed in negotiations gives them a strong incentive to join with management in structuring the negotiating process in a manner least disruptive and costly to both the employer and the union. In the public sector, by contrast, that incentive is diminished because the statute requires the government to subsidize union negotiators. *See* 5 U.S.C. § 7131(a).

For all these reasons, we are convinced that Congress did not intend the FSLMRS to require bargaining over midterm union proposals.

### III.

■ Approval of union-initiated midterm bargaining would also contravene many of the basic purposes of the FSLMRS. An overriding goal of the statute is to protect the "paramount right of the public to as effective and efficient a Government as possible." H.R.Conf.Rep. No. 1717, 95th Cong., 2d Sess. 154 (1978), *reprinted in Legislative History, supra,* at 793, 822; *see also BATF,* 464 U.S. at 92, 104 S.Ct. at 441–42 (noting that the FSLMRS "carefully preserv[ed] the ability of federal managers to maintain 'an effective and efficient Government'"); *National Treasury Employees Union v. FLRA,* 691 F.2d 553, 560–61 (D.C.Cir.1982). Indeed, "Congress recognized in [the FSLMRS] 'the special requirements and needs of the Government,' and carefully directed that its provisions be interpreted 'in a manner consistent with the requirements of an effective and efficient Government.'" *HHS,* 844 F.2d at 1089 (quoting 5 U.S.C. § 7101(b)).

Union-initiated midterm bargaining risks serious interference with this most basic of statutory objectives. As the FLRA recognized in its original analysis of this issue, union-initiated midterm bargaining would diminish "the ability of the parties to rely upon ... basic [collective bargaining] agreements as a stable foundation for their day-to-day relations." *IRS I,* 17 FLRA at 736. Moreover, "[p]arties would be discouraged from engaging in the effort, as part of negotiation of their basic collective bargaining agreement, to foresee potential labor-management relations issues, and resolve those issues in as comprehensive a manner as practicable." *Id.* Rather, as explained above, permitting union-initiated midterm bargaining "would encourage dispersal of the collective bargaining process" and thereby result in seriatim midterm bargaining—and then seriatim FSIP arbitration—over individual issues raised midterm. *Id.* at 736–37. Such an approach to federal-sector labor relations would "enhance the prospect for protracted conflict" that undermines an agency's effectiveness and would result in "the continuous expenditure of resources for both management and [union] representatives." *Id.* at 737.

The FLRA now responds to these concerns by suggesting that the two exceptions it has crafted to union-initiated midterm bargaining allow agencies to mitigate these considerations. First, the FLRA asserts that agency management can avoid the deleterious effects of midterm bargaining on an agency's effectiveness and efficiency simply by negotiating a union waiver, in a so-called zipper clause, of the union's right to negotiate midterm apart from impact and implementation issues. *See IRS II,* 29 FLRA at 166–67. Negotiated waivers, however, are not an adequate solution to the problem. Neither the FLRA nor any court has resolved the question whether such waivers are mandatory subjects of bargaining that an agency may negotiate to impasse.[4] If waiver clauses are only permissive subjects of negotiation, an agency would be denied access to FSIP

---

4. Two judges of the District of Columbia Circuit have indicated their belief that zipper clauses are mandatory bargaining issues. *See FLRA v.* *IRS (Dist. Office Unit), Dep't of the Treasury,* 838 F.2d 567, 568–70 (D.C.Cir.1988) (statement of Edwards, J.).

arbitration over a union's refusal to accept such a clause in the basic labor contract.

More fundamentally, the FLRA's approach to zipper clauses ensures the very uncertainty and litigiousness the FLRA asserts they would allow an agency to avoid. The FLRA interprets zipper clauses as waivers of employees' statutory rights that must be shown to be "clear and unmistakable." *See IRS II*, 29 FLRA at 166. According to the FLRA, application of this standard requires inquiry into "the wording of the provision[,] ... other relevant provisions of the contract, bargaining history, and past practice." *Id.* at 166–67. Because determinations as to whether a waiver is "clear and unmistakable" are made on a case-by-case basis, *id.* at 166, an agency will often be unsure whether the FLRA will, in fact, find a particular contractual provision to be an adequate waiver. Indeed, in private-sector labor law, application of the clear and unmistakable waiver standard in this context has "sowed the seed for hopeless confusion over the legal obligations of bargaining parties." Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB*, 46 Ohio St.L.J. 23, 32 (1985). The first exception devised by the FLRA to the midterm bargaining obligation may thus portend nothing more than a repetition of the NLRB's "long and largely unsuccessful efforts to articulate a coherent theory of the duty to bargain during the contract term, and the doctrine of 'clear and unmistakable waiver.'" *Id.*

The second posited exception to union-initiated midterm bargaining is that an agency need not negotiate over matters "contained in," *IRS II*, 29 FLRA at 166, or "covered by," *Missouri Nat'l Guard, Office of the Adjutant General*, 31 FLRA 1244, 1247 (1988), the basic collective bargaining agreement. This exception, however, has no warrant in the language of the statute. Although the FLRA indicated in its brief that the law of midterm bargaining established in *IRS II* is "just like" that governing midterm bargaining in the private sector, the FSLMRS is not "just like" the NLRA for these purposes. As dis-

cussed above, NLRA § 8(d) expressly exempts from midterm bargaining subjects "contained in" a basic labor contract, *see* 29 U.S.C. § 158(d), but the FSLMRS does not contain a comparable provision. In the absence of some statutory basis for its conclusion, the FLRA acted beyond its authority in finding this exception to midterm bargaining.

Moreover, we cannot embrace the argument of the District of Columbia Circuit that the presence of union-initiated midterm bargaining will promote the policies underlying the statute. Dismissing the FLRA's argument in *IRS I* that union-initiated midterm bargaining undermines effective and efficient government, the *NTEU* court argued that "Congress ... has already drawn the opposite conclusion" in its determination "that collective bargaining contributes to stability in federal labor-management relations, and to effective and efficient government." *NTEU*, 810 F.2d at 300 (citing 5 U.S.C. § 7101(a)). This argument, however, is unconvincing. That Congress determined that, in general, bargaining "contributes to the effective conduct of public business," 5 U.S.C. § 7101(a)(1)(B), does not imply that Congress believed that the public interest is furthered by bargaining in *all* circumstances and over *all* subjects. Indeed, the contrary is manifestly true: In the FSLMRS Congress exempted numerous subjects from an agency's duty to bargain, *see, e.g., id.* §§ 7106(a), 7117(a), and, indeed, even exempted numerous federal employees and agencies from the statute altogether, *see id.* § 7103(a)(2)(B)(i)-(v), (a)(3), and (b).

By the same token, the absence of midterm bargaining will not undercut the statutory commitment to collective bargaining as a basic means of resolving workplace disputes. Any issue that a union wishes to raise can be advanced in the course of negotiating a comprehensive agreement, and issues initially overlooked can be brought up whenever the agreement is renegotiated.

The *NTEU* court also asserted that failure to mandate union-initiated midterm bargaining would violate "the statutory 'goal

of equalizing the positions of labor and management at the bargaining table.'" *NTEU*, 810 F.2d at 300–01 (quoting *American Fed'n of Gov't Employees*, 750 F.2d at 148). Again, we are unpersuaded. The Supreme Court has cautioned that the statute does not "confer on the FLRA an unconstrained authority to equalize the economic positions of union and management," *BATF*, 464 U.S. at 108, 104 S.Ct. at 449, and numerous provisions of the FSLMRS—for example, the management rights provision, *see* 5 U.S.C. § 7106(a)—demonstrate that absolute equality was not Congress' goal. The court in *NTEU* failed to demonstrate that Congress sought to maintain equality between an agency and the union in this particular context.

## IV.

The FLRA's decision to require bargaining over midterm union proposals represents an "'unauthorized assumption by [the] agency of [a] major policy decision[ ] properly made by Congress.'" *BATF*, 464 U.S. at 97, 104 S.Ct. at 444 (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)). Mandating such bargaining is a step with profound implications for public-sector labor law. We believe that such a step is "'inconsistent with [the] statutory mandate [and] frustrate[s] the congressional policy underlying [the] statute.'" *Id.* (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). As a result, the FLRA's decision is "not in accordance with law." 5 U.S.C. §§ 706(2)(A), 7123(c). Therefore, we grant the petition for review, set aside the decision of the FLRA, and deny enforcement of its order.

ENFORCEMENT DENIED.